All right, off to work. The first case for argument is 22-2251 in Re. Richmond. Mr. Shields, please proceed. Thank you, Your Honor. If I may, there's one housekeeping matter. There's a typo in the brief on page 14, line 16, for which I apologize. The date says 2002, which doesn't make sense. It should be 2020, which was the date of our expert Ducharme's declaration. And I'd like to bring to the Court's attention that the patent expired on February 26, 2024, to the extent that that makes a difference in the claim construction standard that would be applied by this Court. It took 10 years in the patent office. How does that affect you going forward? My position is that the patent is patentable either way, under either standard. And in my argument, I'm applying the broadest reasonable construction standard that was applied by the Board. But I did want to bring that to the attention of the Court in case that makes any difference. Because we have some case law that once it's expired, we go back to normal patent construction. It does, but I don't know whether it changes what was already done before. So MPEP 2258 talks about the different standard, whether it's expired or not expired, applied by the patent office. Is there any pending litigation with regard to this patent? Yes, there is, Your Honor. But that will, of course, now that it's expired, it will only be for past infringement. All right. Please proceed with the arguments on this case. Your Honor, I'll get right on to the reasonable probability of success issue. There is no dispute between the parties, between the director and the patent owner, Mr. Richman, who I'm proud to represent here, and I thank the Court for listening to me. It's been a long time in the patent office. There's no dispute that the burden of proving that, both at the preliminary prima facie stage and ultimately falls on the patent office. Ultimately, that is, the patent office's burden to prove is, of course, not a certainty of success, but the burden falls on the patent office. Now, in response to the assertion in the examiner's first official action of an asserted prima facie case and asserted reasonable likelihood of success, Richman responded with two declarations. One was the declaration of its technical expert. That would be Dr. Descharnes and also Dr. Joluria, who is a heat transfer expert. Can I just interrupt? So, one of your points, and I think maybe you're moving beyond this, although you referred to the burden, which is clear, that there's something missing from the board's own opinion, namely a statement of the affirmative basis for thinking that there would be a reasonable expectation of success. That's just not in the board opinion. No, it's not in there. But it is in the examiner's, I guess it's actually called the non-final action, even though it was the last action, and then also, again, in the examiner's answer. And isn't it right what the government says that the regulation fills that gap because the regulation says that when the board affirms a particular ground, it's affirming the full reasoning of the examiner, putting aside what is, I think, a separate question, whether the same incorporation might not be true for a specific argument made on appeal from the examiner to the board. Your Honor, I think that that statement would apply, perhaps, to the examiner's holding regarding cleavage, that the examiner's position was that. The examiner said, I do have an affirmative reason for thinking a skilled medicine would reasonably expect success. These are just parts that are everywhere, but putting, you're just putting them together, a reasonable, you know, a skilled medicine would expect them to work. And then you said, oh, no, no, no, no, no, the thing would basically overheat. Yes, Your Honor, and I believe we presented, I know we presented expert testimony by Dr. Jaluria that at the heat dissipation shown by the data sheets of the preferred embodiment and the other embodiments that were specifically referenced and incorporated by reference from a predecessor, Patton Mueller, my expert evaluated all of those, and the least heat-consuming of those was the one that he used. So the least power of consent. And that, I think, is where, I don't know, the hard thing comes down to. I'm prepared, at least, until I'm told otherwise, that to agree with you that the board was, and the examiner, were both incorrect in saying that there was a conflict between the six degrees and one of your experts. Thank you, Your Honor. Because one, you know, current was running and one current was not running. Yes, Your Honor. So put that aside. The 16 to the 29 is what matters, and surely the board had substantial evidence to say that the relevant dusk temperature is more like 25 degrees Celsius than like 35 degrees Celsius. Accept that for me. There's lots of evidence for that, you know, a substantial evidence standard. At least I don't see how that could be lacking in substantial evidence. But then the board never, well, the board and the examiner each say on the 16th to the 29, if you start at 25, obviously, you'd be over 40. But the problem is that when you said the least heat-generating combination of processor and controller, is peat grass the right pronunciation? Yes, I believe it is. Okay. Is this particular combination, they said, you know, we don't actually see the evidence for the assertion that that is the least heat-generating. And without that, you know, they don't have to accept that 25 plus 16 is the right addition. Your Honor, I'll do my best to try to answer your question. It is the least power-consuming of all the processors and electronic devices and controllers that were identified in such a way that you could determine what their power was likely to be. That was a particular, one of two particular microchip processors, the preferred one of peat grass. That was the, I believe it was the microchip 12C672 processor. And then there was another one that was referred to in a predecessor patent that was incorporated by reference. And there was also a controller. These had data sheets, so you could look them up. You could figure out what they were. And that's what Ducharme used. So of those that could be figured out, that could be analyzed. Even assuming that that is correct, why is that the relevant question? Isn't the relevant question what a relevant skilled artisan looking at peat grass would reasonably expect, right, that's the question, reasonably expect in a prior art reference that clearly covers all kinds of possibilities of processors and controllers. So that expectation doesn't have to be based on, I don't know, independent evidence to the reasonable skilled artisan that examines the heat generating activity of, you know, all kinds of different possibilities. Your Honor, I mean, I see what Your Honor's point is, but there's one very important thing. There was no dispute that there would be failure at 1.47 watts. It really just, there was no challenge to the methodology of Dr. Jaluria during prosecution. The issue was the examiner said, well, you haven't excluded all possibilities. What about all these options? And basically of all those, that list of options, which is basically just a list of resistors and capacitors and you could use any electronic component to put this together, what's missing from all of that is which one of those combinations would be less than 1.47 watts. The undisputed testimony shows that there would be failure if it's 1.47 watts. It doesn't matter what components you put together. If it's not 1.47 watts, which is undisputed testimony under oath and really has to be accepted as fact. So the Patent Office hasn't addressed that at all. They haven't said this combination would be reasonably likely to be less than 1.47 watts. What they said, on the other hand, the opposite of that, they said, Richmond, you haven't proven that every one of those options would use 1.47 watts. And I agree, we didn't do that. I thought they rejected the underlying assumption that the 1.47 W requirement was reliable and not faulty. I think that they, yes, your honor, I believe the director argues that. But in fact, during prosecution, there was no challenge to that whatsoever. I'm sorry, what does it mean for the director to argue that, but there being no challenge? It does sound like opposite things. What I mean, your honor, is that in the evidence, the evidence established that there would be failure at 1.47 watts. So the question then is, of those other options that we did not prove any particular heat generation for, they do have heat generation. So the question then is, is it more likely than not that one of those options was less than 1.47 watts, in which case there would not be failure. But the patent office has not pointed, the examiner did not, the board did not, and the director has not pointed to anything that provides a substantial evidentiary basis to conclude that yes, one of those other options would be likely to use less than 1.47 watts, none. And there's a little bit of a hurdle here for them to prove that, because at the time, Color Kinetics, the assignee of Peatgrass, was, no dispute on this, it was at the forefront of this technology. And so what the patent office's position is, is well, here's a bag of parts that is referred to in Peatgrass, and you haven't proven that it's 1.47 watts, and 1.47 watts, that's the number. The number is, more than that is failure, less than that, I don't know. But I don't assert that less than that is essentially 100% failure. But at 1.47 watts or more, there's failure. So which one of those, which one of those combinations, and there are really millions of them because it's essentially a bag of parts, which one of those is 1.47 watts? This has been in the patent office for 10 years. So just so I can understand it, maybe I'm just behind. Your position is they disagree with your expert because they said, well, there are lots of other things, there are different options for processors for the circuit. But you're saying that's not sufficient to establish reasonable expectation of success because they didn't test those other options. No? Well, not exactly, Your Honor. My position is that if the processor, however configured, uses 1.47 watts or more, it will fail. That's what we proved. And that's because... That's not disputed. Just because the 1.47 watts translates essentially by mathematics into the 16 to the 29 degree. Yes, exactly, Your Honor, through the analysis. Yes. But that was not disputed. What was disputed is, well, that it has to be that number. And, Your Honor, I don't know. The patent office could have cited other references other than Peepgrass that had processors that they could have said, look at this. You could use this processor and it's 1.47 watts. It's less than that. But they didn't do that. They relied exclusively on the listing of just sort of you could use any kind of these parts to put together to make a processor and that you haven't proven that it's more than 1.47 watts. And, of course, I can't because it's just a bag of parts with no identification of how they're made. So what I can only go with is what does the patent office point to in terms of actual prior art? Here's a processor that I can evaluate from some reference that doesn't teach away from the invention, like Cleavage saying it would be boring to use a cycle, or some other reference. Which one of those is... Prove me. Prove it to me. Find me a processor that uses less than that. Point to it. They've had 10 years to do that. And they don't. There's nothing. There's only a bag of parts. And there is no evidence that the patent office points to that can lead to a substantial evidence that could cause somebody to say, yes, it would be likely that one of those options would be less than 1.47 watts. There's simply no evidence of that. Your Honor, I'm going to reserve the rest of my time. Or am I out completely? That's okay. We'll restore some time. All right. Do I have any rebuttal time? You've used it, but we'll restore a couple minutes. Thank you. No worries. Good morning, Your Honors, and may it please the Court. The issue on appeal is the obviousness of claims to an LED lamp with continuous color-changing cycle, powered by solar energy and a rechargeable battery. There is no dispute that every element in the Representative Claim 13 was taught in the prior art. Peepgrass is almost an anticipatory reference. It teaches every element of the claim, including and even suggests. Okay, but why don't we, just because we don't want you to run out of time, too, why don't you begin where your friend left off and discuss with us whether there was sufficient evidentiary, if the burdens were satisfied with respect to the 1.47. So what the Board did was, the Board didn't shift the burdens. No, but we came up with tests saying that various examples of this don't meet the test of under 1.47, right? Right. And it seems to me the Board, or the examiner's answer to that was, well, there are lots of other things you can do, lots of other ways to do this, a million other ways to do this in Peepgrass. And so his evidence isn't probative of anything. Is that, am I correctly asserting? I mean, did the Board come up with anything else to show that there was a reasonable expectation of success? I would put it this way, Your Honor. The examiner showed a very strong motivation to combine. And what the examiner found with Dr. Geloria's testing was that Peepgrass's disclosure of teachings of processors was very broad. And so what the examiner and the Board found, that the evidence didn't show that a person of ordinary skill in the art would have to choose that particular processor and that particular controller to get to, and then dissipate that amount of heat. So they weren't requiring to show failure, but what the Board said was that there wasn't evidence to show that that much heat would have to be dissipated. Now, Appellant says that... Is there sufficient evidence to show that there are other combinations or ways to do it that would work? There is sufficient evidence in the record to show that there would have been a reasonable expectation of success. And what is that evidence? That is that Peepgrass teaches everything, including a reference to solar power. So it is contemplated. Plamp teaches LEDs with solar power connected to a rechargeable battery. And there's nothing in the prior art or the specification that talks about any overheating problems, much less resolving the problem. So if there is a problem of overheating in the prior art, it's not explained in the 827 patent how to address it. So either a person of ordinary skill in the art could work with this combination, or there wasn't a problem. I'm not sure I'm clear on what you're saying. There was sufficient showing of reasonable expectation of success because... Because the prior art shows that LED systems and solar power and rechargeable batteries were all in existence at the time. In fact, the 827 specification even says... But nothing in the prior art shows that if you put them together in this way, it would work. What I would... My answer, Your Honor, would be that it actually does suggest that it would work because... Well, you know, a suggestion in Peepgrass, you can write to... That includes that little parenthetical or... Anyway, the reference to solar does not show that it would work. It's just somebody sitting down and writing said, Oh, you could use it with this, you could use it with that, without having done any work to figure out whether you could actually do it. It does. It is a short passing reference in Peepgrass. But we do have PLAMP that actually talks about the circuitry connecting an LED system to a solar panel and a battery. And then we have the 827 reference itself, which says that these LED color changing systems are in the prior art. It says that solar garden lights are known. And none of these three references suggests at all an overheating problem. So where did this come up because they decided to test some of them and they were overheating? How did this come up in the proceeding? I think this came up on re-examination. They had two experts who did some testing and testified that there would be overheating. Well, in those circumstances, isn't the board or the examiner required to do something more? At least to come up with three other experiments that show that it wasn't overheating? If they come up affirmatively and show it was overheating, I don't know how you pick and choose what you're going to combine here. But is it enough to say, well, there's so many other combinations. So just because they found two were problematic, that doesn't mean anything. And we still have a reasonable expectation of success. That's what I understand was the board's answer to this. I don't think that alone might not be enough. But the board had problems with both experts' testing, the assumptions that they made in the testing. And the rest of the record strongly supports a motivation to combine here. So are you suggesting that the board didn't shift the burden, it just didn't find the expert testimony presented persuasive. And so it didn't alter its finding that there was an expectation of success. Yes, Your Honor, that's what I'm suggesting. And the board did say that. Where did it say that? Because I'm looking at page nine, where I think is where they were discussing this. And they seem to just say here that we agree that they listed another number of options. And we agree that the appellant has not established that all such processor options would dissipate the equivalent of 1.47. As a result, we're not convinced they've proven circuit heat dissipation, blah, blah, blah. And does the board speak to it otherwise, this examiner, or is this what it is? Well, I was going to point you to that and also the page before it where it talks about Dr. Ducharme's testing, which we haven't talked about too much here. But in that passage that you read, Judge Prost, the end of it is that the board says we are not convinced that the appellant has proven heat dissipation such that the combination of references would be at a high risk of temperature-based failure. Just at a high risk. So the reasonable expectation of success doesn't have to be absolute. It just has to be a reasonable. Well, what would be sufficient, in your view, to establish a high risk of temperature-based failure? Well, one thing that appellant could have tried to show is that actually this processor and this controller were maybe an average heat dissipation or maybe it was a lower heat dissipation. And I believe we talked earlier about they said that it was the least power-consuming combination. However, it was just the least out of two. And the two were the two specific parts that they picked. One was just a passing reference in PPRAS and one was from a different patent. So there's no evidence here that it's even an average power-dissipation combination. Much less a lower one or something that a person of ordinary skill in the art couldn't resolve. Does the 827 patent itself identify a processor and controller circuit that includes processor and controller that is different from the particular processor and controller that Dr. Chudloria did his testing on to conclude that those would generate 1.47 watts and therefore make the whole thing too hot? Because if this one works, presumably, there's a circuit that doesn't produce that heat. I may have misunderstood, but that's... I will try to answer your question, Your Honor. The 827 patent is very short. It's only 10 or 11 columns. And there is some discussion of power supply in columns 4 and 5. That's appendix 40 and 41. But they don't go through and list combinations. In column 5, about the middle of the page, it says, the power supply circuit is connected in parallel to the light-operated circuit. And it sort of goes on to describe maybe what the elements of the circuits are. But it doesn't specify anything about which parts or whether there would be overheating or how to avoid it. And there was no enablement rejection here, right? No. Originally, I guess, we're on re-exam, so that wouldn't have been an issue, right? Right. Okay. Do you have anything to say in defense of the assertions by both the board and the examiner that the experts on this point were inconsistent? Because I just don't get that at all. Yes, the examiner explained why he thought the experts were inconsistent. And that was because Dr. Ducharme, when he did his testing without plugging anything in, powering anything, he measured the temperature rise and found that it would rise 6 degrees just sitting in the sun at 25 degrees Celsius. And so his calculation resulted in his theory that at 25 degrees, the thing would work because the 6 degrees would only get the temperature up to 31. But at 35 degrees, it would fail because the temperature, you know, you add 6 degrees and it gets to 41. And 40 was the limit. But Dr. Ducharme's theory was that because of the 4-degree reduction from the color-changing cycle, it would work. So Dr. Ducharme's testing resulted in his theory that at 35 degrees, it's going to work because of that 4-degree unexpected result. Dr. Deloria's testing resulted in a theory that it would not even work at 25 degrees, and it certainly wouldn't work at 35 degrees. And that is the conflict of the two experts that the examiner explained. If there are no further questions, I yield my time. Thank you. Oh, I'm sorry. I do. I'm sorry. I meant that this is a legal question. So it is striking that the board's opinion does not itself articulate or even expressly adopt the examiner's articulation of an affirmative reason that relevant artisan would reasonably expect success. So you have, if I understand things right, you have to rely on the board's adoption as a matter of law of this assertion by a couple of paragraphs that pretty much say the same thing by the examiner in the examiner's documents. Have we adopted that view of the regulation as a precedential matter? I don't have a case law to cite to you, Your Honor, but you're right that 37 CFR 4150 does say that unless the board expressly does not adopt an examiner's reasoning, it's included in the board's decision. I mean, the language maybe bears that understanding, maybe even most naturally bears that understanding. I guess I've seen at least one, I think, non-precedential decision, I think it was non-PREC, that seemed to adopt that. On the other hand, we have a case called Vernetics not too, too long ago, a non-PREC, that rejected the idea that the board's affirmance automatically incorporates the examiner's statement and even referred to the demanding requirement that applies to incorporation by reference in other contexts, particularly, you know, one specification incorporating by reference another material from another specification that has to be focused on precisely what is being examined. So it left me a little uncertain whether this regulation is enough to fill a gap that has to be filled in order to avoid actual burden shifting. Again, I would be happy to provide you a case if we can go look, but I think here the overall picture is that reasonable expectation of success is a part of the motivation to combine analysis. And here the motivation to combine is very strong. It's already in the references and appellant has not disputed the examiner's analysis of that. So I believe it's enough here. Thank you, Your Honor. We'll restore two minutes of rebuttal. If I have any time. Yeah, I'm going to restore two minutes. Okay, two minutes, all right. I'll do it in two minutes. Your Honor, I'll just mention quickly the commercial success. The board overruled the examiner on lack of nexus. The examiner found lack of nexus. It's a little, I mean, I guess I'm not going to foreclose you from doing it, but normally you would read. Oh, okay. Because they won't have enough. That's already in the briefs. I won't waste my time. As far as the 6C go, I think Your Honor has correctly determined there really isn't a conflict. It was just two different circumstances, two different test conditions. So there's really no conflict. The issue of whether it requires 16.8 or 29.8, that arises from the operation of the processor, which is essential to produce the color-changing light. Does your spec identify a circuit that would not have the problems of the particular processor-controller combination that you- I believe it does identify a circuit. I don't recall what that is. There's different reasons why it doesn't fail.  And some of the- But that wasn't litigated here for legal reasons. No, it wasn't litigated here. And at the time, he didn't know why it didn't fail. But in fact, it doesn't. And the issue here is would somebody at the time of the invention have believed that it would succeed? And the answer is no. All they would have to do is do some calculations, find- No, there's no- it's going to fail. We used- the temperatures that were used were those provided by the examiner. So we didn't contest the dusk time temperatures. So the issue of failure at 1.47 or more is really not an issue. The issue is, like I said, whether they can point to a processor in peak browse that would be likely to use less. That wouldn't seem to be a great burden to do that, but the patent office didn't do that. And I think I- since I'm near the end of my time, I will just close it at that. Thank you very much for the opportunity to present to your honors. Thank you. We thank both sides of the cases submitted.